FRANK THAYER ET AL., DEFENDANTS IN ERROR, v. CITY OF ST. JOSEPH, PLAINTIFF IN ERROR.—54 S. W. (2d) 442.

Kansas Court of Appeals.   November 21, 1932.

*Pross T. Cross, Gerald Cross* and *Maurice P. Murphy* for defendant in error.

*Morte H. Craig* and *John W. Mitchell* for plaintiff in error.

ARNOLD, J.—This is an action in damages. There was a verdict and judgment for plaintiffs and against defendant, City of St. Joseph, in the sum of $3,500. Defendant appealed. The appeal was dismissed and the cause is before us for review on a writ of error.

The record discloses that on August 30, 1924, Kenneth Thayer, a boy ten years of age, came to his death in a municipal swimming pool

in the City of St. Joseph, Missouri. Plaintiffs, father and mother of decedent, brought this action in damages for his death. The suit was instituted in the Circuit Court of Buchanan County and by change of venue tried in Andrew County before a jury, resulting in a verdict and judgment, on February 14, 1930, as above indicated.

The amended petition alleges the relationship of decedent and plaintiffs, the ownership and operation of the swimming pool where the drowning occurred; that the pool was operated by defendant ''for public use and benefit'' and, further, that it was operated for hire and profit. It was further charged that defendant, through its agents, extended an invitation to the public generally to attend said swimming pool, upon payment of an admission fee, and gave assurances to the public generally that lifeguards in sufficient numbers and of proper proficiency would be in attendance to safeguard and protect children while indulging in sports and amusements offered by the pool.

It is alleged plaintiffs' said infant son was taken to the pool, in the custody of another; that upon arrival there, the said infant son was required by one of the servants of defendant, to leave the custody of his said chaperon and go unattended to the men's dressing room, for the purpose of preparing himself to enter the waters of the pool; that said servant and agent of defendant promised and assured said chaperon that he would watch out for and look after the safety of said child and see that the child did not go near the water of the pool, and would have him at a point where said chaperon could again take him into her custody.

The negligence charged is that said servant and agent of defendant negligently failed to look after and look out for the safety of said child, and negligently failed to return him to a place of safety where said chaperon could take him in charge; and that said agent and other agents of defendant negligently and carelessly suffered said child to emerge from said dressing room and to wander and find his way to the water of said pool, and that, as a result thereof, the child came to his death by drowning.

An answer filed by defendant later was withdrawn and a demurrer was filed alleging the petition failed to state a cause of action. This demurrer was overruled and defendant, by leave of court, filed answer admitting its corporate status as a municipal corporation (as alleged in the petition) and that it constructed, owned and operated the swimming pool mentioned in the petition, and denying all other allegations therein. As affirmative defense the answer avers that the acts of the city in appropriating the money, the construction, maintenance and operation of the said swimming pool, were performed by the defendant city, without any legal right or authority conferred upon it by the charter applicable to cities of the first class, and the charter under which defendant city operates; and that because of the lack of legal authority conferred upon it to appropriate

the money to construct, to maintain or to operate said swimming pool, no liability of any kind or character accrued to any person against the defendant city on account of the construction, maintenance, or operation of said swimming pool; that if defendant did have the right to appropriate the money for, to construct, to maintain, or to operate said swimming pool under the provisions of its charter, which right is denied, the construction, maintenance and operation of the same were done and performed in defendant's governmental capacity, for the general welfare of the community at large, and by reason thereof, no liability existed against defendant on account of the construction, maintenance or operation of the same by defendant. No reply was filed by plaintiffs but the parties tried the case as if one had been filed.

Motions for a new trial and in arrest were overruled.

The evidence shows plaintiffs were the parents of decedent, and that the swimming pool in question was operated by the board of park commissioners of the defendant city, and that a fee was charged for admission. The evidence further shows that on the occasion in question, decedent entered the premises of the swimming pool in company with four young ladies, or girls, all older than he, namely, Gail Thayer, his sister, Hazel Thayer and Ruth Thayer, his cousins, and a Miss Glasscock who was Mrs. Hopkins at the time of the trial. After the young people had paid the entrance fee and entered the premises, and when they had reached the point where the men and women separated to go to the respective dressing rooms, the entire party, including decedent, started into the ladies' dressing room, which consisted of a large tent. The boy was held by the hand of his sister, Gail Thayer, when an attendant remarked "Ladies to the right and boys (or men) to the left," and when the sister indicated she was going to take the boy with her into the ladies' dressing room, the attendant said the boy would "have to go to the men's dressing room and not to the ladies." The testimony of decedent's sister, Gail, is to the effect she remarked to the attendant that the child must not go into the water alone, as he could not swim, or "don't let him go into the water;" and that the attendant, either by words or action, indicated he would watch the child, and said "he will be all right." That she then stated to the attendant, "he can't swim, can't we take him with us?" It was then the attendant said "he will be all right," and she said "See that he is out here, don't let him go into the water." To this request, the attendant nodded his head in acquiescence. In another place, the sister testified: "Yes, and I asked the attendant to be sure he didn't go into the water," and the attendant said "He will be all right." Decedent then disappeared into the men's dressing room and the sister into the ladies' dressing room; when she came out, she went to the place at the exit from the men's dressing room, where the attendant had promised to have the boy waiting for her.

He was not there. She waited for him for sometime, expecting him to emerge from the men's dressing room at any moment; while she was waiting, she heard some people talking about a little boy lying at the bottom of the pool. She became frightened and rushed to a place on the edge of the pool where a number of people had gathered, forced her way into the crowd and saw decedent lying on the pavement in an unconscious condition, with two men working over him, attempting resuscitation, but their efforts were unavailing.

Miss Glasscock (Mrs. Hopkins) testified:

"We went into the dressing room, the ladies' dressing room, and Kenneth went into the men's dressing room. We undressed and went out and took the shower, as we had to do, and the two cousins, Hazel and Ruth were in swimming, and Gail and I stood there for awhile, not very long, and then we swam over to one side, swimming over and came back, and by that time Gail was becoming worried about Kenneth." Further she testified Gail then sent a little boy to see if Kenneth was in the men's dressing room and he came out and said no one was in there; that they were then attracted to the crowd running to the left of the pool and discovered the boy had been drowned."

Hazel Thayer, one of the cousins, testified in effect, they did not see the boy from the time he went into the men's dressing room until after he was drowned. The other cousin, Ruth, did not testify.

So far as the record shows, no one saw decedent emerge from the men's dressing room, nor enter the water. The first that was known of his drowning was when the body was discovered by a boy named Robert Woods, who testified for plaintiffs, to the effect that he was walking through the swimming pool and felt something touch his leg; that he "thought it was probably some little boy playing," but discovered it was the body of decedent; that a lifeguard came over shortly—"just a matter of seconds," and removed the body from the water. The water where the body was found was four to four and one-half feet deep. The testimony shows that lifeguards, some eight in number, were employed at the pool, having obtained their employment through a competitive examination known as the "Red Cross senior life-saving examination." They were stationed at various points of vantage about the pool and it was their duty to look out for persons in the pool. The testimony on behalf of defendant was to the effect that it was impossible for the lifeguards to keep an eye on everybody in the pool and on everyone who goes under the water and where each one comes up; that it was impossible to give particular attention to every individual in the pool; that there was no way for the lifeguards to know who could swim and who could not; that the attention of none of the guards was attracted to decedent in any way until the witness Woods discovered the body at the bottom of the pool and called the guards.

As shown by the evidence, the pool was irregular in shape, about 361 feet long and 191 feet in width, at the widest place. There were markings on the sides of the cement wall showing the various depths of the water, ranging from three to six feet and over. The decedent was described as being approximately three to three and one-half feet in height and the water in the pool at the place where his body was found was four and one-half feet deep. With the exception of a section of the pool set apart for diving, there were no chains or ropes separating the various sections of the pool. The floor was of a gradual slope for each thirty-seven feet. The point where the boy's body was found was not near the diving space.

The petition does not charge, nor is there any evidence tending to show negligence in the construction of the pool, and this question was not submitted to the jury. At the close of plaintiff's evidence and again at the close of all the evidence, defendant asked a peremptory instruction in the nature of a demurrer in its behalf, but both were refused and each such ruling of the court is assigned as error.

There are five assignments of error presented under three headings in appellant's points and authorities. First it is urged the operation of the swimming pool for hire or profit was beyond the scope of the powers of the city, and defendant, therefore, is not liable for damages in the operation thereof. In support of this contention, it is argued there is no statute authorizing a city of the first class to construct, maintain or operate a swimming pool for hire or profit; that the powers conferred upon a city of the first class or its park commissioners, with reference to the maintenance, regulation and operation of parks are prescribed in Sections 7806-7811, Revised Statutes 1919 (now Secs. 6303-6308, R. S. 1929); citing Kennedy v. City of Nevada, 281 S. W. 56, 60, which quotes the general rule in this respect, as laid down in 19 Ruling Case Law 768, 770:

"It is well settled that a municipal corporation has only such powers as are clearly and unmistakably granted to it by its charter or by other acts of the Legislature, and consequently can exercise no powers not expressly granted to it, except those which are necessarily implied or incident to the powers expressly granted and those which are indispensable to the declared objects and purposes of the corporation."

The general rule is stated in 43 Corpus Juris 1711, page 933, as follows:

"It is a general rule that a municipal corporation is not civilly liable for damages suffered by individuals in person or property by tortious acts which are wholly outside the powers conferred on the municipality by its charter or other legislative enactment, and since a municipality cannot confer upon its officers and agents lawful authority to represent it beyond its corporate powers, the rule of non-

liability applies to *ultra vires* acts of such officers or agents, whether the acts are directed by the municipality, or are done without express direction or corporate sanction, the liability, if any, resting upon the individuals who perform such acts.''

This general rule has been followed in Missouri. [See Kennedy v. City of Nevada, 281 S. W. 56; Duckworth v. Springfield, 194 Mo. App. 51; Stealy v. Kansas City, 179 Mo. 400, 78 S. W. 599; Mitchell v. Clinton, 99 Mo. 153; Rowland v. City of Gallatin, 75 Mo. 134.]

Defendant's position in this respect might be tenable if plaintiffs' cause of action were based wholly upon the theory that the swimming pool in question were operated for hire and profit, but the petition may not be thus construed, the language being, as follows:

''The defendant, acting through and by its departments, officers, agents and servants, constructed, erected, maintained and operated, for hire and profit, and for public use and benefit, a certain municipal pool or public swimming pool,'' etc.

Section 6107, Revised Statutes 1929, provides:

''Any city of the first class in this State . . . may purchase, condemn, receive and hold property, real and personal, . . . for the purpose of establishing parks, parkways; . . . for the establishment of hospitals, poorhouses, houses of correction or detention, or for any other purposes; . . .''

Section 6307 reads:

''Said board of park commissioners shall have power, and it shall be its duty, to devise and adopt a system of public parks, parkways and boulevards, for the use of the city and its inhabitants, and . . . to lease, purchase, condemn or otherwise acquire, in the name of the city, lands for parks, parkways, boulevards or public squares, . . .''

And Section 6308 provides:

''Said board of park commissioners shall also have power to superintend, control and manage any and all parks, parkways and boulevards belonging to or under the control of the city, and such other public grounds and thoroughfares as may, by ordinance, . . . be placed under control and management of said board, and to construct, improve, adorn, regulate and maintain the same in such manner as it may deem best, . . .''

It is noted Section 6107 confers upon cities of the first class the power to acquire and own lands for the purpose of establishing parks, etc., and ''for any other purposes;'' and Section 6308 extends the powers to ''such other public grounds and thoroughfares'' as may by ordinance be placed under the control and management of such board. The words ''other purposes'' used in the statute may be properly construed as embracing such recreation places as swimming pools. We have no doubt the Legislature so intended. Moreover, the word ''park'' when used in a legal sense has rather a broad meaning.

According to Webster's Dictionary, it is "a piece of ground within a city or town inclosed and kept for ornament or recreation. The Standard Dictionary defines the word as "a tract of land set apart for ornament or recreation." In the case of Withnell v. Petzold, 17 Mo. App. 674, the St. Louis Court of Appeals, adopts and quotes the Webster definition. The Supreme Court in State ex rel. v. Schweickardt, 109 Mo. 496, defines the word, as follows:

"A park is variously defined to be 'a pleasure ground in or near a city set apart for the recreation of the public;' 'a piece of ground enclosed for purposes of pleasure, exercise, amusement or ornament.' Perrin v. Railroad, 36 N. Y. 120; 'a place for the resort of the public for recreation, air and light . . . a place open for everyone.' [Price v. Inhabitants, 40 N. J. L. 613.]"

This court in Longwell v. Kansas City, 203 S. W. 657, adopts the definition in the Schweickardt case, stating:

"A park is variously defined to be 'a pleasure ground in or near a city set apart for the recreation of the public;' 'a piece of ground inclosed for purposes of pleasure, exercise, amusement, or ornament' . . . ; 'a place open for every one.'"

Words & Phrases, 2d series, Volume 3, page 872, defines "park" as follows:

"A 'park' is a place for the resort of the public for recreation, air and light. [Village of Riverside v. Maclain, 71 N. E. 408, 414, 210 Ill. 308, 66 L. R. A. 288, 102 Am. St. Rep. 164.]"

"A 'park' may be defined as a piece of ground set apart to be used by the public as a place for rest, recreation, exercise, pleasure, amusement, and enjoyment. [Northport Wesleyan Grove Camp-meeting Assn. v. Andrews, 71 Atl. 1027, 104 Me. 342, 20 L. R. A. (N. S.) 976.]"

"A 'park' is defined in the Century Dictionary as a piece of ground set apart and maintained for public use. [Commonwealth v. Hazen, 56 Atl. 263, 265, 207 Pa. 52.]"

We rule the plot of ground on which defendant constructed and maintained the swimming pool in question clearly is embraced within the meaning of the statute found in the above definitions. [Capp v. City of St. Louis, 251 Mo. 345, 158 S. W. 616; Jensen v. Kansas City, 181 Mo. App. 359, 168 S. W. 827; Longwell v. Kansas City, 199 Mo. App. 480, 203 S. W. 257.] We also hold the defendant city was acting within its powers and was therefore liable for any of its negligent acts relative thereto, and the plea of *ultra vires*, under the facts herein, is not tenable. We have examined the cases cited by defendant on this question and hold them not in point. The point is therefore ruled against defendant.

The next point urged is that there is no evidence that defendant city, or any of its officers, agents or employees was guilty of negligence causing or contributing to the death of plaintiffs' son, and the

cause should not have been submitted to the jury. In other words, that the demurrers should have been sustained and that the trial court erred in its ruling in this respect. It is insisted there is no evidence to base a finding that any agent or employee of defendant was negligent, "unless such finding could be based upon the mere fact that none of the lifeguards or other appointees of the park board happened to see him go under the water and fail to come up."

From the argument of counsel, it is clear that what is meant is that there was no direct evidence to the effect that the agents of the city negligently contributed to the drowning of the boy. Direct evidence, under the circumstances detailed in the record, is not always obtainable, and there is no such evidence in this case. However, the facts and circumstances must be taken into consideration, and if they are such that the jury might well conclude there was negligence, there is no error in submitting the case. In support of its contention in this respect, defendant cites two cases, i. e., Giles v. Railroad, 169 Mo. App. 24, 154 S. W. 852, and Spindler v. Express Co., 232 S. W. 690. The Giles case was a suit for the death of a trespasser killed by a freight train in the railroad yards. The court held the only duty owed the trespasser was not to wantonly injure him. The ruling in that case has no application here. And in the Spindler case, the court applied the rule that the master is not the insurer of the safety of his servant and the express company was not negligent in furnishing freight elevators in a railway station. This case is not in point. Without detailing again the evidence of plaintiffs of the entrance of the boy and his sister into the pool enclosure, the promise of the attendant that he would look after the boy, after refusing to allow him to go into the ladies' dressing room, and the further fact that eight lifeguards were on duty at the time whose business it was to see that everyone entering the pool should first go through the shower bath and that no attention was paid to this boy, might well be determined by the jury to constitute negligence. The testimony of Walter Skoglund, superintendent of parks of defendant city, in reply to questions by one of the jurors would well support plaintiffs' contention that no sufficient protection was made for the safety of children visiting the pool. We quote from the record:

"BY A JUROR: Q. As I understand, this is the children's department, the southwest? A. Not exactly.

"Q. Oh, it is not set aside for them? A. No, sir.

"Q. They can go anywhere they please? A. They can go anywhere they please.

"Q. Whether they swim or not? A. Yes.

"THE JUROR: All right."

In the case of Jensen v. Kansas City, 181 Mo. App. 359, 168 S. W. 827, an opinion by this court, a very similar state of facts is presented. It was held the question of whether the city was negligent

in not keeping better protection against the imprudence of children was a question for the jury. It must be held in the case at bar that a failure to see the boy before he entered the pool means a failure to look. To look was to see. [Capp v. St. Louis, supra.] We need not pursue this point further. We rule the same against defendant.

Finally, it is charged plaintiffs' instruction No. 1, which purports to cover the entire case and directs a verdict, was erroneous in that it authorized the jury to find negligence based upon the mere fact of permitting the boy to enter the pool unattended, if an agent or servant of defendant ordered and required him to leave the persons with whom he had entered the premises and go to the men's dressing room instead of that of the ladies, without regard to whether such order or requirement was negligent, and, also, in that it was calculated to mislead the jury to believe the defendant city was under a duty to exercise a higher degree of care than it would have been under, in the absence of such an order, even though the order was not negligent. Defendant cites the case of Hunter v. Am. Brake Co., 231 S. W. 659, in support of this contention. We have read the Hunter case and find the instruction so unlike that before us as to be of no help here. The instruction complained of in the case at bar is long, and it is unnecessary to set it out in full. It requires the jury to find, before it can return a verdict for plaintiffs, that the servants of defendant city

". . . carelessly and negligently failed to exercise ordinary care to keep a lookout for and to watch for the safety of the said child Kenneth, and negligently and carelessly suffered and permitted him to go unattended (if he did) from the said men's dressing room to the waters of said pool, and negligently and carelessly permitted him to enter into the waters thereof and into depths thereof that were over his head and not reasonably safe for him, and that as a direct and proximate result thereof . . . he was thereby drowned;"

We rule the instruction is free from the vice charged against it, and there was no error in giving it. For the reasons above stated, the judgment is affirmed. All concur.