WILLIAM H. JONES, Plaintiff, *v.* KANE & ROACH, INC., et al., Defendants.

Supreme Court, Onondaga County, July 23, 1943.

*Gerald A. Grant* for plaintiff.

*Russell Harrington* for Kane & Roach, Inc., defendant.

*John H. Hughes* and *George S. Sullivan* for Crucible Steel Company of America, defendant.

*James C. Tormey, Corporation Counsel (John F. Hmiel* and *Dwight C. Dale* of counsel), for City of Syracuse, defendant.

SEARL, J. The defendant City of Syracuse maintains a public park and playground known as McKinley Park, located in the southern section of the city. At the northerly end of the park is a baseball field and a regulation ball diamond. West Newell Street, a paved highway of the city, having cement sidewalks on both sides, forms the northerly boundary of the park and ball ground. The home plate of the regulation diamond is some 330 feet southerly of the southerly sidewalk on West Newell Street.

The Y. M. C. A. had sponsored an industrial soft-ball league, made up of teams from various local industries. The City of Syracuse had granted permits for scheduled games to be played on this and other city playgrounds, including this particular game.

On the 3rd day of June, 1942, two teams arrived at McKinley Park, around 6:30 P. M., and finding that the regulation diamond had been rendered muddy by a recent rain proceeded to hold the game at a point described as part of " left field " of the regulation diamond. Evidence was introduced to show that on various occasions this location was used, that there were clearly defined base lines, a home plate and pitcher's box.

While the game was in progress, plaintiff left his home on Ostrander Avenue, which was south of the park, and walked northerly on a path that ran along the west side of the ball grounds. Upon arriving at a point along the path close to where the game was in progress, he stated that he stopped for a few moments to talk to some neighbors who stood there watching the game, and that he then proceeded again northerly to the south sidewalk of West Newell Street, where he turned right and walked a short distance easterly on the walk, heading for home, as he stated, when he was suddenly hit in the face by a ball coming from the park. His glasses were broken, the glass penetrating the eye, and the testimony discloses that he has lost all but two per cent of the vision of the right eye.

It appears that the game had reached the fourth or fifth inning. The first ball thrown in this inning by the pitcher of the so-called " Halcomb Team," made up of employees of the Crucible Steel Company of America, was " wild," passed over the head of the batter and catcher, struck a basket attached to

the front of a bicycle standing alongside of a boy on the sidewalk watching the game and bounded from the basket, striking plaintiff as indicated.

No backstop had been erected at this point, although one had been placed at the rear of the regulation diamond. A wire screen had been erected along the east and west sides of the field where it adjoined other property, but no protection had been placed on the north side where the field adjoined this highway.

A nonsuit was granted as to defendants, Kane & Roach, Inc., and as to Crucible Steel Company of America, as no facts were shown sufficient to go to the jury as to these two defendants. Although the evidence disclosed that as to the defendant Kane & Roach, Inc., the secretary of the company donated the required entrance fee for the employees comprising the team, it likewise appeared that this defendant did not supervise the team and the games were played after hours and not on company time. No proof whatever was offered to show corporate responsibility on the part of Crucible Steel Company of America for acts of members of the so-called "Halcomb Team."

As to the City of Syracuse, evidence was introduced by both witnesses for plaintiff and the surveyor sworn by defendant that there was a more or less well-defined diamond where the game was taking place; plaintiff offered evidence of constructive notice to the City to the effect that games had been played there for some time past, and that balls, foul, batted or pitched, had come into the highway. One Joseph Tomlinson testified that he had charge of maintenance at the park and that his hours were from 3 to 10 P. M.; that he had seen games played at the location in question, but had no recollection of being at the park at the time of the accident.

A question of fact was presented as to whether the hazard was unreasonable.

The Fourth Department had before it very similar facts in *Lamm* v. *City of Buffalo* (225 App. Div. 599), where it was held that " a fair question of fact was presented as to whether the city violated its duty of ordinary care in inviting and encouraging ball games to be played on this diamond in Delaware Park, in the city of Buffalo, which was located so close to a public highway that balls batted by the players were liable to drop in the road and strike travelers lawfully traveling thereon." In that case, Mr. Justice CROUCH dissented, saying: " On highways some degree of danger always exists. . * * * Whether the hazard here was unreasonable depended not alone upon the

propinquity of highway and diamond. ' Locality, surroundings, methods, the degree of danger, and the custom of the country are the important factors.' '' In the case at bar most of these factors have been covered by the evidence. The home plate, over which the ball was pitched, was some twenty-six feet directly north from the sidewalk. A straight pitched ball would travel forty-one feet from home plate to the edge of the sidewalk, as the line of flight would be northwesterly. This walk was elevated six feet above the playing field so that the jury could well find that a high pitched ball might readily strike a pedestrian, and that the hazard was increased by the line of flight of a pitched ball being toward the highway. The fact that the section generally was residential and that the east and west sides of the ball park were screened to prevent balls from flying on to private property might well have been considered by the jury as contrasted with the fact that the side contiguous to the highway was left without protection. The diamond usually used had a back stop. This one had none. The balls were being pitched not by boys, but by grown men. All these, and other features, were '' methods '' that bring the instant case within the distinguishing elements urged by Justice CROUCH in his dissenting opinion.

Although the complaint alleged negligence and nuisance at the time of the accident, the case was given to the jury on the question of negligence only. An allegation of nuisance was contained in the complaint, but it referred to existence only at the time of the accident. This was clearly insufficient, unless the City had an opportunity to abate the same.

A somewhat unique question as to contributory negligence was presented. Under those authorities which almost universally hold that a spectator at a ball or hockey game who chooses a seat unprotected by a screen or netting assumes the risk of being hit, the instant plaintiff would have lost his right to recover had he come within the category of a '' spectator.'' (*Murphy* v. *Steeplechase Amusement Co.*, 250 N. Y. 479; *Kaufman* v. *Madison Square Garden Corp.*, 246 App. Div. 593; *Hammel* v. *Madison Square Garden Corp.*, 156 Misc. 311; *Zeitz* v. *Cooperstown Baseball Centennial, Inc.*, 29 N. Y. S. 2d 56.) The evidence clearly shows he was on the sidewalk when struck. He stated he was walking. There was no direct evidence that he was standing and watching the game. Inasmuch as defendant took the position that plaintiff was standing on the sidelines talking to a neighbor shortly before making his way to the sidewalk and urged the probability of his being a spectator after reaching the sidewalk, the court charged that the jury

might distinguish between a " spectator " and a " casual spectator; " that if plaintiff was making his way as a pedestrian, and stopped for an instant to casually or incidentally glance at the players, as a pedestrian might stop casually and glance at two motor cars colliding, under such circumstances plaintiff would not necessarily thereby have assumed the risk so as to defeat his recovery. However, the jury were told, that even under such circumstances it was his duty to conduct himself as a reasonably prudent pedestrian.

The facts in the instant case are not comparable to those in *Lane* v. *City of Buffalo* (232 App. Div. 334, 339), cited by defendant, where plaintiff was struck by a ball claimed to have come from a playground, striking plaintiff while on private premises. In the cited case there was no proof that plaintiff was actually hit by a baseball. The court, in its opinion in the *Lane* case, distinguished the instant case when it wrote: " This is not the case where a ball game is permitted to be played on grounds near a public street, and where balls are batted long distances with considerable force, and are liable to strike and injure persons on the highway, as was the case in *Lamm* v. *City of Buffalo* (225 App. Div. 599)."

Defendant's motion to set aside the verdict and for a new trial is denied.